**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Woodbridge Hospitality, LLC,<br><br>                    Plaintiff,<br><br>vs.<br><br>First American Title Company,<br><br>                    Defendant. | No. CV-23-01271-PHX-SPL<br><br>**ORDER** |

Before the Court is Defendant First American Title Company's ("First American's") Motion for Summary Judgment (Doc. 45) and accompanying Statement of Facts (Doc. 46), Plaintiff Woodbridge Hospitality LLC's ("Woodbridge's") Response (Doc. 50) and Controverting Statement of Facts (Doc. 51)[1], First American's Reply (Doc. 52), and Woodbridge's Sur-Reply (Doc. 57). The Court now rules as follows.[2]

**I.    BACKGROUND**

This case arises out of a contract dispute between Woodbridge and First American in connection with the sale of an extended stay hotel in Paradise Valley, Arizona (the "Property"). (Doc. 45 at 5). Woodbridge was formed in 2003 by brothers Suhkbinder

---

[1] Pursuant to Plaintiff's Notice of Errata (Doc. 53), Exhibits 1, 2, 3, 6, and 8 to Plaintiff's Controverting Statement of Facts were resubmitted as exhibits to Doc. 53.

[2] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

("Suky") and Jasbir ("Jas") Khangura. (Doc. 46 ¶ 1). In 2020, Woodbridge declared bankruptcy, and as part of the bankruptcy, planned to sell the Property to Sterling Real Estate Partners. (*Id.* ¶ 2). Woodbridge engaged a bankruptcy attorney, a real estate attorney, an accountant, and a broker to assist in the sale. (*Id.* ¶ 4). They also engaged Defendant First American to facilitate the escrow process, and the matter was assigned to Alix Graham ("Graham"), a Senior Commercial Escrow Officer. (*Id.* ¶ 10).

In August 2021, Woodbridge alleges that Suky Khangura, who took primary responsibility for handling the Property sale, had a telephone call with Graham regarding the potential for completing a 1031 exchange.[3] (*Id.* ¶¶ 3, 11). During that call, Graham allegedly stated that First American could facilitate a 1031 exchange for Woodbridge, but that it "could not be set up until the closing, when funds would be available to be held in escrow" (the "Alleged Statement"). (*Id.* ¶ 11). At some point following this call between Suky and Graham, Suky had a discussion with the accountant, Tariq Khan ("Khan"), who informed Suky that Graham's statement—that the 1031 exchange could not be set up until *after* closing—was incorrect. (*Id.* ¶ 12). Around the time the Alleged Statement was made, both Suky and Khan had some understanding, based on previous experience, that a 1031 exchange had to be set up pre-closing, contrary to Graham's statement. (*Id.* ¶¶ 13–14; Doc. 51-2 at 11; Doc. 45-1 at 21–22). Nonetheless, based on his alleged conversation with Graham, Suky believed that he had an agreement with First American to set up a 1031 exchange (the "Oral Agreement"). (Doc. 51 ¶ 56).

On January 27, 2022, Khan emailed Graham, stating that "Woodbridge's intention is the transaction qualifies for 1031 construction exchange" and briefly explaining what a 1031 exchange is. (Doc. 51-5 at 5). However, he did not ask Graham or First American to take any further action regarding the 1031 exchange. (*Id.*). First American is affiliated with

---

[3] A 1031 exchange "is a transaction in which an asset is sold and the proceeds of the sale are then reinvested in a similar asset. No capital gain or loss is recognized, allowing the deferment of capital gains taxes that would otherwise have been due on the first sale." *Jenkins v. Jenkins*, 156 P.3d 1140, 1142 (Ariz. Ct. App. 2007) (citation omitted); *see also* 26 U.S.C. § 1031.

2

a separate company, First American Exchange Company, LLC, that handles 1031 exchange services, and Graham testified that typically, if asked about a 1031 exchange, she would "refer them to First American's exchange division." (Doc. 46 ¶ 16; Doc. 51 ¶ 16; Doc. 51-6 at 5). Graham did not respond to Khan's January 27 email, and did not refer Woodbridge to First American's exchange division until March. (Doc. 51 ¶¶ 58–59).

On February 1, 2022, Woodbridge's bankruptcy attorney, Philip Rudd ("Rudd"), sent a draft closing instruction letter to First American for its review. (Doc. 46 ¶ 17). The only mention of the 1031 exchange in that letter stated:

> This transaction is also a part of a 1031 exchange involving the Seller. Please comply with any further written instructions you receive from me, the Seller, and/or Tariq Khan of R&A CPAs, Seller's CPA, so that the transaction satisfies the requirements for the sale to qualify as part of a 1031 exchange.

(Doc. 46 ¶ 18). Woodbridge and First American had the opportunity to, and did, revise the closing instructions, but no material changes were made to the instruction regarding the 1031 exchange. (*Id.* ¶¶ 20–21). On February 2, Woodbridge executed an Escrow Agreement with First American, which does not mention a 1031 exchange. (*Id.* ¶¶ 22–23). However, the Escrow Agreement does contain a Limitation of Liability provision, which states that First American, as the escrow agent, "shall not have any duties or responsibilities in respect of the Escrow Funds except those set forth in this Agreement." (*Id.* ¶ 24; Doc. 45-1 at 131). Additionally, the Agreement has an integration clause, providing that "[t]his is the entire Agreement among the parties with respect to the matters set forth herein, and all prior oral and written agreements with respect to the matters set forth herein are superseded by the terms of this Agreement." (Doc. 46 ¶ 24; Doc. 45-1 at 131). Again, Woodbridge and First American had the opportunity to, and did, revise the Escrow Agreement, but like the Closing Instructions, the final Escrow Agreement contained no provision regarding First American's alleged agreement to facilitate a 1031 exchange. (Doc. 46 ¶¶ 26–27).

Also on February 2, Graham emailed Rudd, noting that the Closing Instructions

mentioned a 1031 exchange and asking if there were any 1031 documents forthcoming. (*Id.* ¶ 29). Rudd responded that he would send her 1031 exchange documents "separately once we get there," and noting that Khan "will be working with us on that aspect of that transaction." (*Id.* ¶ 29; Doc. 45-1 at 173). Rudd testified that he believed First American was already working on the 1031 exchange. (Doc. 51 ¶ 61). The evening of February 2, Graham received authority to record and close the sale, which ultimately closed on February 3, 2022. (Doc. 46 ¶ 31). Khan did not respond to the February 2 email from Graham, and First American did not receive any further instructions from Woodbridge regarding the 1031 exchange until February 16. (*Id.* ¶¶ 30, 32–33). On February 16, Khan emailed Graham, "Please see my email dates [sic] January 27. I have not heard from you about 1031 exchange for this sale and want to make sure it is properly set up. Can you provide us the name and contact information of your exchange intermediary?" (*Id.* ¶ 33; Doc. 51-5 at 3–4). Graham responded that "[t]he funds are being held in escrow for the time being, pending disbursement order from the Court. I believe you will be able to set up the 1031 at that time." (Doc. 46 ¶ 34; Doc. 51-5 at 2). However, Graham's February 16 email statement, like the Alleged Statement made in August 2021, was incorrect; the 1031 exchange account needed to be set up prior to the close of sale for the exchange to occur. (Doc. 46 ¶ 37).

On March 16, Rudd followed up with Graham about the status of the 1031 exchange. (Doc. 51 ¶ 75). She responded that Woodbridge would need to make arrangements with a 1031 exchange accommodator, and she copied a member of First American's exchange division on the email. (*Id.* ¶ 76). On March 17, Suky, Khan, and Michelle Mautz from First American ("Mautz") spoke on the phone, after which Khan sent Mautz an email confirming that Suky was authorizing Mautz to proceed with the 1031 exchange. (*Id.* ¶¶ 79–80). Khan emailed Mautz again on March 18, and she responded that she acknowledged the email, but that First American did not have an active exchange for Woodbridge. (*Id.* ¶¶ 81, 83). When Rudd inquired about opening an active exchange, Mautz replied that First American could not open an exchange because the closing date had passed. (*Id.* ¶¶ 84–85). Rudd,

Khan, and Suky subsequently contacted multiple exchange companies to try to set up a 1031 exchange, but none of the other companies could assist, and no 1031 exchange took place. (*Id.* ¶¶ 87–89). Finally, on April 19, 2022, Rudd emailed Graham and Mautz with final payment information approved by the bankruptcy court and asked that the funds allotted to Woodbridge be transferred to the 1031 exchange account. (*Id.* ¶¶ 90–91). Mautz responded that she could not set up an exchange for the funds. (*Id.* ¶ 92). On May 31, 2023, Woodbridge filed an action in Maricopa County Superior Court, which First American removed to federal court on July 10 based on diversity jurisdiction. (Doc. 1 at 2–3).

## II.     LEGAL STANDARD

This case was removed to federal court on the basis of diversity jurisdiction, so the Court must apply the substantive law of Arizona. *E.g.*, *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981) ("It is well settled that a federal court exercising diversity jurisdiction must apply substantive state law."). However, federal law will govern procedural questions, including the summary judgment standard. S*ee Martinez v. Asarco Inc.*, 918 F.2d 1467, 1470 n.3 (9th Cir. 1990).

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy its burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id*. at 322–23. When considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorably to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

///

///

///

### III. DISCUSSION

First American moves for summary judgment on Woodbridge's single remaining claim for breach of contract.[4] It argues that the claim fails because the alleged oral contract made between Suky and Graham in August 2021 (the "Oral Agreement") is in direct conflict with the parties' written and fully integrated agreements, the Escrow Agreement and Closing Instructions executed on February 2, 2022. (Doc. 45 at 9). However, Woodbridge argues that there is no conflict between the Oral Agreement and the written Escrow Agreement and Closing Instructions because they address entirely different subjects. (Doc. 50 at 7).

"The parol evidence rule precludes admission of any understandings or representations made prior to or contemporaneously with the written contract if the contract was intended as a final and complete integration of the parties' agreement." *Formento v. Encanto Business Park*, 744 P.2d 22, 25 (Ariz. Ct. App. 1987); *see also United States Fid. & Guar. Co. v. Olds Bros. Lumber Co.*, 430 P.2d 128, 130 (Ariz. 1967) ("It is firmly established that where an agreement is reduced to writing in such terms as to express a complete contract, evidence of a contemporaneous oral agreement relating to the same subject matter, varying, contradicting or enlarging the written agreement, is inadmissible, in the absence of an allegation of fraud or mistake."). Despite the parol evidence rule, "[e]xtrinsic evidence is admissible to show that it was not the intention of the parties that the entire agreement be incorporated in the written agreement or that there was a separate agreement dealing with different subject matter. Whether the writing was intended to embody all of the agreement between the parties is in itself a question for the trier of fact." *Turley v. Adams*, 484 P.2d 668, 671 (Ariz. Ct. App. 1971). However, the Court may grant summary judgment in First American's favor if it "can determine as a matter of law that

---

[4] Two claims were initially brought by Woodbridge against First American: (1) negligent misrepresentation and (2) breach of contract. (Doc. 1-1 at 9–10). However, Woodbridge stipulated to dismissal of the negligent misrepresentation claim prior to First American filing its Motion for Summary Judgment. (Doc. 43).

the writing on its face imports a legal obligation without any uncertainty as to the object or extent of such engagement." *See id.*

Here, it is undisputed that the Escrow Agreement contained a limitation of liability clause stating that First American "shall not have any duties or responsibilities in respect of the Escrow Funds except those set forth in this Agreement" and an integration clause stating that "[t]his is the entire Agreement among the parties with respect to the matters set forth herein, and all prior oral and written agreements with respect to the matters set forth herein are superseded by the terms of this Agreement." (Doc. 45 at 10–11; Doc. 45-1 at 131); *see Turley*, 484 P.2d at 671 ("Before the parol evidence rule may be invoked, there must first be a determination that there has been an integration of an agreement into a writing or writings."). An integration clause often "suggests there would be no occasion to consider parol evidence in interpreting the terms of the parties' contractual agreements." *Talking Rock Land, LLC v. Inscription Canyon Ranch, LP*, 2024 WL 1532685, at *6 (Ariz. Ct. App. 2024).

"Arizona has adopted the Restatement (Second) of Contracts § 213 (1981) as the 'general rule of contract law' regarding integration clauses." *Dunn v. FastMed Urgent Care PC*, 424 P.3d 436, 440 (Ariz. Ct. App. 2018) (quoting *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 397–98 (1984)). Section 213 of the Restatement provides the following:

> Where writings relating to the same subject matter are assented to as parts of one transaction, both form part of the integrated agreement. Where an agreement is partly oral and partly written, the writing is at most a partially integrated agreement. . . . Whether a binding agreement is completely integrated or partially integrated, it supersedes inconsistent terms of prior agreements. To apply this rule, the court must make preliminary determinations that there is an integrated agreement and that it is inconsistent with the term in question. Those determinations are made in accordance with all relevant evidence, and require interpretation both of the integrated agreement and of the prior agreement. The existence of the prior agreement may be a circumstance which sheds light on the meaning of the integrated agreement, but the integrated agreement must be given a meaning to which its language is reasonably susceptible when read in the light of all the circumstances.

Restatement (Second) of Contracts § 213 (1981) (citations omitted). The fundamental question at issue, then, is whether the Oral Agreement relates to the same subject matter as the Escrow Agreement and Closing Instructions; if so, if the Oral Agreement is inconsistent with the terms of the Escrow Agreement and Closing Instructions, it is superseded by them.

Woodbridge asserts, in a conclusory manner, that "[t]he escrow process and 1031 exchange process are entirely separate." (Doc. 50 at 6). However, as First American points out, it is "a specious argument that the scope of First American's duties concerning escrow funds . . . does not encompass setting up a 1031 exchange even though Woodbridge's complaint is that First American did not set up a 1031 exchange account to receive the Escrow Funds prior to closing." (Doc. 52 at 2). Both the Escrow Agreement and the alleged Oral Agreement pertain to First American's responsibilities concerning the escrow funds created by the sale of the Property, and the Escrow Agreement specifically tasks First American with placing the escrow funds "in an interest bearing account at First American Trust FSB" as opposed to, e.g., a 1031 exchange account. (Doc. 45-1 at 129). No reasonable jury could find that the Oral Agreement pertained to different subject matter than the Escrow Agreement and Closing Instructions; all three agreements set forth the scope of First American's duties regarding the proceeds of the sale of the property, whether they were to be placed in a typical escrow account or a qualified 1031 exchange account. Furthermore, the directive for First American to place the escrow funds in the specified account would directly contradict any oral instruction or agreement requiring First American to place the funds in a qualified 1031 exchange account.

Because the Oral Agreement pertains to the same subject matter as the Escrow Agreement and Closing Instructions, the Escrow Agreement is a complete statement of the parties' engagements, and the Oral Agreement would contradict the written Escrow Agreement, this Court agrees with First American that the alleged Oral Agreement was superseded by the parties' later agreements, and as such, there can be no viable breach of contract claim for violations of the Oral Agreement. *See S. H. Kress & Co. v. Evans*, 189 P. 625, 626 (Ariz. 1920) ("The law is very firmly settled that when parties have put their

engagements into writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of the undertaking was reduced to writing, and all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time it is completed, or afterwards, is rejected."); *see also Grubb & Ellis Management Services, Inc. v. 407417 B.C., L.L.C.*, 138 P.3d 1210, 1213 (Ariz. Ct. App. 2006) ("A general principle of contract law is that when parties bind themselves by a lawful contract the terms of which are clear and unambiguous, a court must give effect to the contract as written.").

Accordingly,

**IT IS ORDERED** that Defendant First American Title Company's Motion for Summary Judgment (Doc. 45) is **granted**. The Clerk of Court shall enter judgment against Plaintiff and in favor of Defendant and **terminate** this action.

Dated this 3rd day of March, 2025.

Honorable Steven P. Logan
United States District Judge